USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-2035 KELLI SWAIN, Plaintiff, Appellant, v. LAURA SPINNEY, EDWARD HAYES, AND THE TOWN OF NORTH READING, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF MASSACHUSETTS [Hon. George A. O'Toole, Jr., U.S. District Judge] ___________________ ____________________ Before Stahl, Circuit Judge _____________ Bownes, Senior Circuit Judge ____________________ and Lynch, Circuit Judge. _____________ ____________________ Michael Tyler, with whom Michael Edward Casey was on brief, for _____________ _____________________ appellant. Douglas I. Louison, with whom Regina M. Gilgun and Merrick & ___________________ __________________ _________ Louison were on brief, for appellees. _______ ____________________ June 25, 1997 ____________________ LYNCH, Circuit Judge. Kelli Swain was subjected to LYNCH, Circuit Judge. _____________ a strip search and visual body cavity inspection, while being held in a cell in the North Reading, Massachusetts police station. This search occurred after Swain had been in the cell for twenty minutes, and more than an hour after she was arrested. She was arrested with her boyfriend as a result of his shoplifting; she was suspected of having possessed a small baggie of marijuana. The search was ordered, she says, by a police officer immediately after he had interrogated her, while knowing she was represented by counsel. He had become angry with Swain for saying she knew nothing about her boyfriend's shoplifting. Swain's boyfriend, who was also in custody, whose shoplifting had triggered the arrests, and who had an extensive criminal record, including drug crimes, was not strip-searched. The charges against Swain were eventually nol prossed. Swain brought suit under 42 U.S.C. 1983 and Mass. Gen. Laws ch. 12, 11H, 11I, alleging that the search humiliated her and caused lasting emotional damage. The district court granted summary judgment for the defendants. The court held that there were no material facts in dispute which would support Swain's claims that the search was not reasonable under the Fourth Amendment and that the officers were not entitled to immunity. We hold that, as alleged by Swain, a jury could find that the search was not justified by -2- 2 a reasonable suspicion, and that the jury should have the opportunity to resolve the factual disputes pertinent to the issue of whether the officers were entitled to the protections of qualified immunity. Swain fails, however, to meet the exacting standards for municipal liability under  1983, even on her version of the facts. Accordingly, the judgment of the district court with respect to the individual defendants is reversed, but the grant of summary judgment as to the Town of North Reading is affirmed. I. We review the facts in the light most favorable to Swain, the party opposing summary judgment. On May 18, 1993, Kelli Swain and her boyfriend, Christopher Milbury, went apartment hunting in the Danvers, Massachusetts area. Around 10:00 a.m., after the couple had been driving for a little while, Milbury told Swain that he needed to pick up some things at Moynihan Lumber. Swain waited in the car while Milbury went into the store; he was gone about ten minutes. When Milbury got back, he placed a bag behind the seat and started to leave the parking lot. As they drove out of the parking lot, Swain saw Moynihan Lumber employees pointing at the car; she also saw a police cruiser pulling into the lot just as she and Milbury were pulling out. Swain became very upset. She began questioning Milbury about what was going on. Then, after they had driven -3- 3 200 or 300 yards, the police cruiser, which had been following the couple since the parking lot, turned on its blue lights and its siren; Milbury pulled their car over. Officer Robert Marchionda then approached the vehicle and Milbury got out of the car. Swain remained in the car for a minute or two, and then got out when she saw Milbury being handcuffed. As Swain got out, she dropped a baggie of marijuana on the ground about three feet away from the car. Officer Marchionda had seen Swain put her hands behind her back and drop an object onto the grass, but could not, at that point, identify the object. Officer Marchionda radioed for backup, and another officer, Officer Romeo, arrived soon thereafter. Swain then approached the officers, but was stopped by one of them, who restrained her with his hands. She asked what was going on, and was told that Milbury was suspected of taking things from Moynihan Lumber. Officer Marchionda then arrested Swain and handcuffed her. While he was handcuffing her, he saw that the dropped object was a baggie of marijuana. He retrieved it. Swain was pat frisked at the scene, but nothing was found on her person. When the police searched the car, they found $400 worth of hardware in the trunk, which had been taken from another store in Gloucester, Massachusetts, and another $400 worth of sawblades, wrapped in a hardware flyer, under the front seat. Swain was surprised to see the merchandise -4- 4 there. The police implied that she was an accomplice to Milbury's theft; she kept saying that she did not know anything about it. Milbury also told the police that Swain was innocent. Neither of the officers ever asked her about the marijuana on the ground. Swain did not see anyone pick up the marijuana and did not know if anyone had seen her drop it. After about thirty minutes at the scene, Swain and Milbury were transported in a police cruiser to the North Reading Police Station. When she got to the station, her handcuffs were removed. Swain was seated at a booking desk, and an officer had her sign a rights card. Matron Laura Spinney, the chief of police's secretary, was called to the booking desk because a female was under arrest. While in the booking area, Swain asked to go to the bathroom. Matron Spinney escorted her to a bathroom, but did not come in with her. Swain was allowed to close the door almost all of the way, leaving it open just a little. Spinney stood outside the door to the room, where she could hear Swain using the facilities, but could not see Swain.  Swain then returned to the booking area, and was told that she could make a phone call. She was shown to a small office, and a police officer stood outside. She called her attorney and spoke with him for five to ten minutes. -5- 5 While Swain was seated in the booking area, her pocketbook was searched by Spinney. Spinney found cigarette rolling papers in the pocketbook. No one discussed these papers with Swain. At that point, one of the officers advised Swain that marijuana had been found at the scene and that she was going to be charged in connection with it. Swain denied that it was her marijuana.  Swain was then fingerprinted and photographed. Officer Ed Hayes, the prosecuting officer and detective department supervisor, ordered Matron Spinney to take Swain to a cell. Spinney pat frisked Swain before taking her to the cell and found nothing on her. Swain was left alone in the cell for about twenty minutes. According to Swain, Sergeant Hayes then came to her cell and attempted to question her about Milbury's criminal activities. Hayes yelled at Swain, telling her that she was lying, and that she should tell him what was going on. Swain, who was crying hysterically, kept repeating that she honestly knew nothing.  According to Swain, Hayes' questioning lasted approximately fifteen minutes and then he "walked out in a huff." Hayes states that he only stayed with Swain in the cell area for approximately one minute. He has no recollection of what he discussed with Swain, but asserts that it would be normal procedure for him to talk to detainees to advise them about their arraignments. He does -6- 6 not recall interrogating Swain about Milbury's activities, but cannot state that he did not do so. Milbury, who was located in another cell where he could hear but not see Swain, stated that he heard Hayes talking to her and also heard Swain crying and saying that she was innocent. About five to ten minutes after Hayes' departure, Spinney returned and apologetically informed Swain that Hayes had ordered her to strip search Swain. It is Hayes' testimony that he believes he would have ordered such a search prior to speaking with Swain. Spinney does not know whether the search was ordered before or after Hayes spoke with Swain, but knows that Hayes did not order a strip search when he originally told Spinney to take Swain to the cell. Spinney states, however, that the order to strip search came almost immediately after she brought Swain to the cell, and not a significant amount of time later.  Swain could not understand why she was being searched and began crying again. Spinney then ordered Swain to remove all of her clothing except for her bra. Spinney shook out each item as Swain took it off. Spinney then made Swain bend over and spread her buttocks. Swain was very upset and shaking uncontrollably the entire time. Swain was then told she could get dressed. Spinney found nothing during her search. The entire procedure lasted fifteen minutes. Hayes had not told Spinney what to look for, but -7- 7 Spinney knew that marijuana had been found at the scene, and assumed that she was looking for drugs.  Swain asserts that, before she was asked to strip, Spinney assured Swain that the video camera in the cell area was already off. Swain did not see her turn the camera off. Chief of Police Henry Purnell testified, however, that the station cameras, including the one in the female cell, are constantly left on. Videotapes are sometimes made from these cameras, but the Department has no policies or procedures concerning the making, storage, or retention of these tapes. Matrons are instructed to turn the cell camera off, by pressing a button, when conducting a search. Spinney states that she turned the camera off with a wall switch before searching Swain, but does not recall telling Swain that the camera was off or making any comments about the camera at all.  Milbury, who had an extensive criminal record, was never strip searched. Hayes was aware of Milbury's history of drug convictions and knew that Milbury was on probation, having pulled the records while booking Milbury. Swain had no prior criminal convictions. Officer Hayes, for his part, tells a different story. He asserts that he ordered the strip search of Swain immediately upon his arrival at the booking desk, which occurred as soon as he was informed that the arrests had been -8- 8 made, and, he believes, before he spoke with her. According to Hayes, he ordered the search because the arresting officer showed him the marijuana and informed him that Swain was a principal suspect in a narcotics incident. He also asserts that he suspected Swain of carrying a concealed weapon, although he acknowledges that this was a generalized suspicion of narcotics suspects, rather than a suspicion based on any characteristics of Swain. Later that day, Milbury and Swain were arraigned in Woburn District Court and released on their own recognizance. All charges against Swain were eventually "nol prossed" or continued without a finding. Swain suffered continuing emotional trauma as a result of the search and sought counseling.  The Town of North Reading's policy on strip searches is outlined in a memo on "Inventory Search Policy," prepared in 1989 by training officer Lieutenant Edward Nolan. The Policy states that: "A strip search of the arrestee is warranted only if the police have probable cause to believe that the arrestee is concealing contraband or weapons on his body." Chief Purnell testified that, in any arrest involving drugs, all arrestees are strip searched. The shift commander -- normally the highest-ranking officer on duty -- makes the determination of when a strip search is warranted.  -9- 9 The Municipal Police Institute (MPI), a statewide police association, publishes a book called "Police Manual: Policies & Procedures." Chief Purnell testified that the North Reading police adhere to the MPI policies. The relevant MPI policy is as follows: A strip search of an arrestee is warranted only if officers have reasonable suspicion to believe that the arrestee is concealing contraband or weapons on his body. 1. All body strip-searches must be approved by the officer-in-charge, who shall consider the following question: Is the crime one that is normally associated with weapons or contraband? Only if the answer to this question is yes and there is a reasonable suspicion that the arrestee has weapons or contraband on his person will a body strip-search be authorized. 2. Body cavity searches should not be conducted without the express approval of the officer-in-charge, and require a search warrant signed by a judge.  However, both Sergeant Hayes and Matron Spinney testified that they were unaware that North Reading had any policy with regard to strip searches. Hayes testified that it was his policy to strip search individuals whenever narcotics were involved in the case. Nonetheless, he did not order a strip search of Milbury. II. -10- 10 Swain claims, under 42 U.S.C. 1983 and Mass. Gen. Laws ch. 12, 11H, 11I, that Laura Spinney, Edward Hayes, and the Town of North Reading violated her rights under the United States and Massachusetts Constitutions by subjecting her to an unreasonable search. On defendants' motion for summary judgment, the district court held that, under United ______ States v. Klein, 522 F.2d 296 (1st Cir. 1975), the search of ______ _____ Swain was within the bounds of the Fourth Amendment. It thought Klein unaffected by Bell v. Wolfish, 441 U.S. 520 _____ ____ _______ (1979). The district court further held that the individual defendants were, in any event, entitled to qualified immunity from suit. As to the Massachusetts law claims, the court found that, in this area, Massachusetts constitutional law tracked the federal standards. Finally, the district court found that Swain had failed to meet the exacting standards for municipal liability under 1983. Swain argues on appeal that the police must have probable cause to believe that an arrestee is concealing weapons or contraband in order to strip search that arrestee. She further argues that, even if the search needed only to be supported by a reasonable suspicion, no such suspicion was present and that the officers are thus not entitled to the protections of qualified immunity.  -11- 11 We review the district court's grant of summary judgment de novo. EEOC v. Amego, Inc., 110 F.3d 135, 141 _______ ____ ___________ (1st Cir. 1997).  III. A strip and visual body cavity search of an arrestee must be justified, at the least, by a reasonable suspicion. Because a jury could find that Officer Hayes acted without a reasonable suspicion that Swain was concealing drugs or weapons, we find that Swain has stated a claim against the individual defendants sufficient to withstand a motion for summary judgment. Furthermore, while some courts have suggested that a higher standard may be ______ necessary to justify a strip search and visual body cavity inspection, it was clearly established at the time of the search that the Fourth Amendment requires at least a _________ reasonable suspicion to conduct these types of searches. Significant factual disputes remain, rendering it impossible to resolve conclusively the immunity question on summary judgment. A. Strip Searches, Visual Body Cavity Inspections, and the _____________________________________________________________ Fourth Amendment ________________ "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that amendment." United States v. _____________ -12- 12 Robinson, 414 U.S. 218, 235 (1973). Thus, under Robinson, if ________ ________ the arrest was lawful, a searching officer does not need to have any further justification for performing a full body search of an arrestee. See United States v. Bizier, 113 F.3d ___ _____________ ______ 214, 217 (1st Cir. 1997). Moreover, a search incident to arrest need not occur at the scene of the arrest, but "may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards, 415 U.S. 800, _____________ _______ 803 (1974). However, Robinson did not hold that all possible ________ searches of an arrestee's body are automatically permissible as a search incident to arrest. To the contrary, any such search must still be reasonable: Holding the Warrant Clause inapplicable to the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." Edwards, 415 U.S. at 808 n.9 (quoting Terry v. Ohio, 392 U.S. _______ _____ ____ 1, 20 (1968)). In Robinson itself, the Court noted that the ________ search at issue, while thorough, did not have "extreme or patently abusive characteristics." 414 U.S. at 236 (citing Rochin v. California, 342 U.S. 165 (1952)). Later, in ______ __________ Illinois v. Lafayette, 462 U.S. 640 (1983), the Court ________ _________ explicitly stated that "[w]e were not addressing in Edwards, _______ and do not discuss here, the circumstances in which a strip -13- 13 search of an arrestee may or may not be appropriate." Id. at ___ 646 n.2. "Robinson simply did not authorize" a strip and ________ visual body cavity search. Fuller v. M.G. Jewelry, 950 F.2d ______ ____________ 1437, 1446 (9th Cir. 1991); see also Mary Beth G. v. City of ________ ____________ _______ Chicago, 723 F.2d 1263, 1271 (7th Cir. 1983)("[T]he Robinson _______ ________ court simply did not contemplate the significantly greater intrusions that occur[]" in a visual body cavity inspection.).  A strip and visual body cavity search thus requires independent analysis under the Fourth Amendment. In Bell v. ____ Wolfish, 441 U.S. 520 (1979), the Supreme Court noted that _______ "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Id. at 559. Rather, the evaluation of the constitutionality ___ of a warrantless search requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. Id. In Wolfish, the Supreme Court applied this balancing ___ _______ test to a prison policy that required arraigned pre-trial detainees to "expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." Id. at 558. Noting that "this practice instinctively gives ___ -14- 14 [the Court] the most pause," id. at 559, the Court found only ___ that visual body cavity searches can "be conducted on less than probable cause." Id. at 560. In so holding, Wolfish ___ _______ "did not, however, read out of the Constitution the provision of general application that a search be justified as reasonable under the circumstances." Weber v. Dell, 804 F.2d _____ ____ 796, 800 (2d Cir. 1986). In applying the Wolfish balancing test to searches _______ of the type to which Swain was subjected, courts have recognized that strip and visual body cavity searches impinge seriously upon the values that the Fourth Amendment was meant to protect. These searches require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others. This is often, as here, done while the person arrested is required to assume degrading and humiliating positions. Our circuit has "recognize[d], as have all courts that have considered the issue, the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities." Arruda v. Fair, 710 F.2d 886, 887 (1st ______ ____ Cir. 1983). The Seventh Circuit has described "strip searches involving the visual inspection of the anal and genital areas as demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." Mary Beth G., 723 _____________ -15- 15 F.2d at 1272 (internal quotation marks omitted); see also ________ Wood v. Clemons, 89 F.3d 922, 928 (1st Cir 1996) ("[A] strip ____ _______ search can hardly be characterized as a routine procedure or as a minimally invasive means of maintaining prison security. Indeed, a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual."); Kennedy v. Los _______ ___ Angeles Police Dep't, 901 F.2d 702, 711 (9th Cir. _______________________ 1990)("Strip searches involving the visual exploration of body cavities are dehumanizing and humiliating."). On the other side of the scales, courts must weigh the legitimate needs of law enforcement. Institutional security has been found to be a compelling reason for conducting warrantless strip and visual body cavity searches. See, e.g., Wolfish, 441 U.S. at 559 (prisoner strip searches ___ ____ _______ after contact visits justified because detention facility "is a unique place fraught with serious security dangers"). Some courts have held that a warrantless strip search may also be justified by the need to discover and preserve concealed evidence of a crime. See, e.g., Justice v. Peachtree City, ___ ____ _______ ______________ 961 F.2d 188, 193 (11th Cir. 1992). But see Fuller, 950 F.2d _______ ______ at 1446 (strip and visual body cavity search with less than probable cause only permitted to protect institutional safety and security; search for evidence must be justified by probable cause). -16- 16 Balancing these interests, courts have concluded that, to be reasonable under Wolfish, strip and visual body _______ cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons.1 See, e.g, Justice, 961 F.2d at 192; Masters v. ___ ___ _______ _______ Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Weber, 804 F.2d ______ _____ at 802; Stewart v. Lubbock County, 767 F.2d 153, 156 (5th _______ _______________ Cir. 1985); Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir. _____ ________ 1984); Mary Beth G., 723 F.2d at 1273. This court has held _____________ that the reasonable suspicion standard is the appropriate one for justifying strip searches in other contexts. See Wood, ___ ____ 89 F.3d at 929 (prison visitors); United States v. _______________ Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991)(non- ___________________ routine border searches); cf. Burns v. Loranger, 907 F.2d ___ _____ ________ 233, 236-38 (1st Cir. 1990) (officers protected by qualified immunity for warrantless strip search of arrestee where there were exigent circumstances and probable cause to believe controlled substance would be found on arrestee's person).  Accordingly, it is clear that at least the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context as well.  ____________________ 1. As noted above, the Ninth Circuit has held that, absent a threat to institutional security, the higher showing of probable cause is required to justify such a search. Fuller, ______ 950 F.2d at 1446. -17- 17 Defendants, and the court below, rely upon United ______ States v. Klein, 522 F.2d 296 (1st Cir. 1975). In that case, ______ _____ the defendant, who was arrested after a sale of cocaine, was subjected to a strip search, including a visual inspection of his rectum. Id. at 299. This court approved that search as ___ "[a] post-arrest search of the person, plainly approved by Edwards," and found that a lack of individualized suspicion _______ that the suspect was harboring evidence did not render the search unreasonable. Id. at 300 & n.2.  ___ Klein was decided before significant Supreme Court _____ precedent in the area, and we are bound by the Supreme Court's developing doctrine. Klein predates Lafayette, _____ _________ decided in 1983, where the Supreme Court stated that Edwards _______ did not answer the question of when a strip search was appropriate. Lafayette, 462 U.S. at 646 n.2. Klein also _________ _____ predated Wolfish, with its explicit recognition of the _______ invasiveness of strip and visual body cavity searches. Wolfish, 441 U.S. at 558. Subsequent to Klein, and sensitive _______ _____ to the developing doctrine, this circuit has repeatedly recognized that strip and/or visual body cavity searches are not routine, and must be carefully evaluated. See Burns, 907 ___ _____ F.2d at 236-37; Bonitz v. Fair, 804 F.2d 164, 170-72 (1st ______ ____ Cir. 1986); Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. _________ ____ 1985); Arruda, 710 F.2d at 887. Accordingly, to the extent ______ that Klein held that strip and visual body cavity searches _____ -18- 18 are simply searches incident to arrest, and do not need to be further tested for reasonableness under the Fourth Amendment, it does not survive Lafayette, Wolfish, and this court's _________ _______ subsequent strip search decisions.  B. The Search of Swain ______________________ Turning to the particular search at issue, we conclude, taking all the facts in the light most favorable to Swain, that a jury could find that the search was unreasonable and thus violated the Fourth Amendment. Accordingly, we find that Swain has stated a trialworthy claim under 42 U.S.C. 1983. On these facts, there appears to be the distinct possibility that Officer Hayes ordered the strip search in retaliation for his failed interrogation of Swain in her cell, imposing sexual humiliation on her as a punishment for what he perceived as her non-cooperation. Hayes' angry response to Swain's inability to provide information about Milbury's activities and the timing of the search raise this inference. This possibility distinguishes this case from Klein, where the court found that there was _____ "no evidence that the stripping was a pretext to humiliate or degrade." Klein, 522 F.2d at 300.2 We must thus examine _____  ____________________ 2. We also recognize that, under United States v. Whren, 116 _____________ _____ S. Ct. 1769 (1996), a police officer's subjective motivations do not serve to invalidate a search for exclusionary rule purposes, so long as the search was objectively reasonable under the circumstances. Whren, however, also stressed that _____ "the Constitution prohibits selective enforcement of the law based on considerations such as race," id. at 1774, and, we ___ -19- 19 whether, on these facts, an objective officer would have had a reasonable suspicion that Swain was concealing drugs or contraband on her person. Three factors suggest that there were not adequate grounds to justify the strip and visual body cavity search of Swain. First, there is the timing of the search. Swain had been alone in the cell for some period of time before she was searched and no one thought it important to search her before she angered Hayes by not giving him the information he sought. Perhaps more importantly, she had been allowed to go to the bathroom by herself, unobserved, prior to being taken to her cell. This also indicates that no one thought she had secreted drugs in her private parts. Cf. Burns, 907 F.2d at 238 (common ___ _____ knowledge that drug users and dealers with controlled substances on their persons often attempt to flush drugs down the toilet). If a warrantless strip search may be justified by the need to avoid the destruction of concealed evidence, Swain already had had ample opportunity to destroy any such evidence. To the extent there was any reason to believe such  ____________________ would assume, gender. The exclusionary rule, as the Supreme Court recognized in Malley v. Briggs, 475 U.S. 335, 344 ______ ______ (1986), balances different interests than those in a 1983 action. ("While we believe the exclusionary rule serves a necessary purpose, it obviously does so at a considerable cost to the society as a whole, because it excludes evidence probative of guilt. . . . On the other hand, a damages remedy for [a Fourth Amendment violation] imposes a cost directly on the officer responsible . . ., without the side effect of hampering a criminal prosecution."). -20- 20 evidence still existed, further delay to obtain a warrant would not have significantly increased the risk of destruction. This was particularly true because Swain was kept under observation and recorded by video camera while in the holding cell. Second, as noted, the most compelling justification for warrantless strip and visual body cavity searches is institutional security. It is uncontroverted that, prior to her arraignment, Swain was the only person in the women's holding cell of the North Reading Police Station. Her arraignment was later the same afternoon, and she was then released, on her own recognizance. There was no risk that she would come into contact with other prisoners, or be able to smuggle contraband or weapons into a secure environment. Hayes stated that he believed that Swain, as a narcotics suspect, might have been carrying a concealed weapon but he did not assert that Swain posed a threat to his safety or that of others in the police station. The institutional security justification thus appears to be absent from this case.  Third, there is the differential treatment by the police of the young woman and her boyfriend. Swain and Milbury were first pulled over because of Milbury's shoplifting activities. Officer Hayes stated that, prior to searching Swain, he had examined both Swain's and Milbury's -21- 21 records. Officer Hayes knew that Milbury was on probation and had a history of drug convictions. By contrast, Swain did not have a criminal record. Milbury had told officers, including Hayes, that the marijuana was his. Yet Milbury was not strip searched. If there was an objective basis -- apart from retaliation -- for stripping Swain, it would have been objectively reasonable, and more so, to search Milbury as well. On the other hand, Swain did drop a baggie of marijuana at the scene of the crime. Officer Hayes expressed the view (belied by his failure to strip search Milbury) that a strip search was justified whenever narcotics are involved in the case. This is not consistent with either the Town policy, which requires probable cause, or the MPI policy, which requires an individualized suspicion, even where the crime involves contraband or weapons. The record does not reveal how much marijuana was in the baggie Swain dropped, nor does it reveal whether possession of that amount constitutes a misdemeanor or a felony under Massachusetts law. Nothing in the record suggests that Swain was suspected of being a distributor of marijuana. The fact that Swain may have possessed some unspecified amount of marijuana is not enough to overcome, as a matter of law, the factors, discussed above, under which a jury could find the search of Swain unreasonable. -22- 22 Accordingly, we hold that a jury could lawfully find that there was no objectively reasonable basis for strip searching Swain and that, on these facts, Swain has stated a claim for violation of her Fourth Amendment right to be free from unreasonable searches that survives defendants' motion for summary judgment. C. Qualified Immunity _____________________ Defendants assert that they are, in any event, entitled to qualified immunity from suit. There are two prongs to the qualified immunity analysis. First, was the constitutional right in question clearly established at the time of the alleged violation? St. Hilaire v. Laconia, 71 ___________ _______ F.3d 20, 24 (1st Cir. 1995). That is a question of law for the court. Elder v. Holloway, 510 U.S. 510, 516 (1994). _____ ________ Second, would a reasonable, similarly situated official understand that the challenged conduct violated that established right? St. Hilaire, 71 F.3d at 24.  ___________ The Fourth Amendment right to be free from unreasonable strip searches has long been clearly established in this circuit, as elsewhere. See Burns, 907 F.2d at 236; ___ _____ Blackburn, 771 F.2d at 569 ("It can hardly be debated that . _________ . . in 1977, [there was] a 'clearly established' Fourth Amendment right to be free of unreasonable searches."). As discussed above, Klein's holding that such a search is a _____ reasonable search incident to arrest had been abrogated by -23- 23 subsequent Supreme Court and First Circuit cases, and had been squarely rejected by the other circuit courts to consider the issue. See Fuller, 950 F.2d at 1446, 1449 n.11 ___ ______ (holding that strip search with visual body cavity inspection was not justifiable as a search incident to arrest but was governed by higher standard, and rejecting Klein); Mary Beth _____ _________ G., 723 F.2d at 1271 n.7 (searches like the one in Klein are __ _____ only constitutional where there is a reasonable belief that arrestee is concealing contraband; routine post-arrest strip search of misdemeanants is unconstitutional); see also Weber, ___ ____ _____ 804 F.2d at 801 nn. 6 & 7, 803 (holding that it was, in 1986, "clearly established" that policy of routine strip and visual body cavity searches of arrestees was unconstitutional, and citing "ten opinions from seven circuits" that refused to condone such searches). Defendants themselves agree that the search must be evaluated under the reasonableness standard articulated by the 1979 Supreme Court decision in Wolfish.  _______ The question is thus whether an objectively reasonable officer would understand that a strip search of Swain was, under these circumstances, unreasonable. This prong of the inquiry, while requiring a legal determination, is highly fact specific, and may not be resolved on a motion for summary judgment when material facts are substantially in dispute. 2 Nahmod, Civil Rights and Civil Liberties ____________________________________ -24- 24 Litigation: The Law of Section 1983 8.08, at 136-39 (3d ed. ___________________________________ 1991).  The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury. But if there is a factual dispute, that factual dispute must be resolved by a fact finder. St. Hilaire, 71 F.3d at 24 n.1 (internal citations omitted); ___________ Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1041 (1st Cir. __________________ ______ 1988)("While the qualified immunity inquiry is ultimately a question of law, it may also necessitate determining certain of the essential facts.")(citing Anderson v. Creighton, 483 ________ _________ U.S. 635 (1987)); see also Consolo v. George, 58 F.3d 791, ________ _______ ______ 794 (1st Cir.) (where law is clearly established, and there is ample evidence that officers acted unreasonably, proper to submit issue of objective reasonableness to the jury on special interrogatories), cert. denied, 116 S. Ct. 520 _____________ (1995). We recognize that the immunity question should be resolved, where possible, in advance of trial. See, e.g., ___ ____ Veilleux v. Perschau, 101 F.3d 1, 2 (1st Cir. 1996). ________ ________ However, disposition of the question on summary judgment is not always possible. Here, some material facts are significantly in dispute. Swain's story and that of Officer Hayes conflict on the timing of the relevant events. Some -25- 25 proffers are supported or contradicted by other witnesses, including Spinney and Milbury. Hayes contends that, as the officer in charge of the investigation, he ordered the search immediately upon being informed that a narcotics violation had occurred. The timing of when the search was ordered is essential to a determination of whether defendants' conduct was objectively reasonable. There are thus factual issues, potentially turning on credibility, that must be resolved by the trier of fact. Only after the resolution of these conflicts may the trial court apply the relevant law on objective reasonableness.3  We also recognize that police officers are protected in close cases by the doctrine of qualified immunity, and that immunity serves to protect law enforcement from the chilling threat of liability. Vargas-Badillo v. ______________ Diaz-Torres, --- F.3d ----, 1997 WL 276662 (1st Cir. May 30, ___________ 1997); Joyce v. Town of Tewksbury, 112 F.3d 19, 23 (1st Cir. _____ _________________ 1997) (patent violation of law necessary to strip police officers of qualified immunity). On the other hand, qualified immunity does not protect "those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 ______ ______  ____________________ 3. In St. Hilaire, we noted that the proper division of ____________ functions between judge and jury on the objective reasonableness inquiry may be accomplished either through special interrogatories or through carefully structured jury instructions. St. Hilaire, 71 F.3d at 24 n.1; see also ___________ ________ Nahmod, supra, 8.08, at 137. We leave that decision here _____ to the trial court.  -26- 26 (1986). Here, further resolution of the facts is necessary to determine whether or not this case falls into the category of "close cases" in which the police are accorded "a fairly wide zone of protection." Roy v. Inhabitants of the City of ___ ___________________________ Lewiston, 42 F.3d 691, 695 (1st Cir. 1996). On the facts as ________ related by Swain, Officer Hayes used a warrantless strip search and visual body cavity inspection as a tool to humiliate and degrade her in retaliation for her refusal to respond to interrogation. Independently of the issue of allegations that Officer Hayes deliberately violated the law in order to retaliate, as forbidden by Malley, Swain also asserts the ______ search is not, on its facts, objectively reasonable. This search, on Swain's allegations, occurred after she had ample opportunity to dispose of any hidden evidence and when she was alone in a monitored cell, posing no danger to others that might justify hastily proceeding without a warrant. Such allegations, if true, do not represent a "close case" but a flagrant violation of the Fourth Amendment's guarantee against unreasonable searches. Whether those allegations are true or not must be resolved by the finder of fact.  D. Municipal Liability ______________________ Swain claims that the Town of North Reading is liable for the injuries that she suffered. The Supreme Court -27- 27 has recently clarified the necessary showing for a claim of municipal liability under 1983: [I]n Monell and subsequent cases we have ______ required a plaintiff seeking to impose liability on a municipality under 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. . . . . As our 1983 municipal liability jurisprudence illustrates, however, it is not enough for a 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. Board of the County Comm'rs v. Brown, 117 S. Ct. 1382, 1388 ___________________________ _____ (1997) (discussing Monell v. New York City Dep't of Social ______ ______________________________ Servs., 436 U.S. 658 (1978), and progeny).  ______ Here, Swain predicates municipal liability on a failure to properly communicate to the police force a uniform policy on when strip searches are appropriate and who may authorize them. This failure to train, Swain alleges, rose to the level of conscious indifference to the constitutional rights of arrestees. Swain accurately notes that the various police personnel, including the police chief, expressed some confusion as to when strip searches are warranted.  -28- 28 The Supreme Court addressed failure to train claims in Brown: _____ We concluded in Canton that an ______ "inadequate training" claim could be the basis for 1983 liability in "limited circumstances." We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. Existence of a "program" makes proof of fault at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action -- the "deliberate indifference"--necessary to trigger municipal liability. Id. at 1390 (discussing and citing Canton v. Harris, 489 U.S. ___ ______ ______ 378 (1989)). Swain does not, however, point to any other incidents in which the North Reading police force violated the rights of arrestees through strip and visual body cavity searches. There was thus "no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate." Id.  ___ The Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of constitutional violations. "[I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law -29- 29 enforcement officers with specific tools to handle recurring situations." Id. at 1391.  ___ This is not that case. Officer Hayes and Chief Purnell agreed that every officer was supplied with policy guidelines, including periodic updates. Lieutenant Nolan's memo requiring strip searches to be justified by probable cause was such an update. The police officers also agreed that the MPI, colloquially known as the "police manual," was to be followed by, and was available to, the North Reading force. Apparently, not all the officers had a consistent understanding of those materials. However, it is undisputed that North Reading did have an appropriate policy that was distributed to the force; absent prior claims, it cannot be reasonably inferred that Chief Purnell knew, or should have known, that his officers were not executing that policy. Accordingly, Swain cannot make the requisite showing of "deliberate indifference" to her constitutional rights. We affirm the grant of summary judgment as to the Town of North Reading. E. State Law Claim __________________ The Massachusetts Declaration of Rights, article 14, gives every person the right to be free from "unreasonable searches." The Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, 11H, 11I, provides a private right of action for persons who are deprived of rights protected by -30- 30 either federal or state law. The district court concluded that the protections of article 14 tracked the Fourth Amendment protections of the federal Constitution, and that the search of Swain was reasonable under both federal and state law. We agree that cases like Rodriques v. Furtado, _________ _______ 575 N.E.2d 1124 (Mass. 1991), indicate that the state constitution provides at least the level of protection against strip and visual body cavity searches as does the federal Constitution. However, in some instances, the Supreme Judicial Court has concluded that "art[icle] 14 provides more substantive protection to criminal defendants than does the Fourth Amendment." Commonwealth v. Upton, 476 ____________ _____ N.E.2d 548, 556-57 (Mass. 1985) (rejecting federal standard for determining probable cause based on confidential informant tips); see also Commonwealth v. Blood, 507 N.E.2d ________ ____________ _____ 1029 (1987). The Supreme Judicial Court has also noted that the Massachusetts law on body cavity searches under article 14 remains uncharted territory. Rodriques, 575 N.E.2d at 884 _________ n.8. The SJC did remark, however, that the federal cases on searches in prisons were not "germane" to a body cavity search of a suspect for evidence "because of the 'diminished' Fourth Amendment rights of prisoners and their visitors." Id. (citations omitted). This remark certainly suggests the ___ possibility that Massachusetts law might place greater -31- 31 limitations on the use of strip and visual body cavity searches of arrestees than the federal Constitution does.  We need not attempt to predict fully what course Massachusetts law will take. The Massachusetts Constitution certainly does not provide less protection than federal law. ____ Having found that the search of Swain may have been objectively unreasonable under the federal Constitution, we conclude that the law of the Commonwealth would at least view the search similarly, and we therefore reinstate her state law claim against the individual defendants. Defendants contend that Swain cannot prove that her injuries were perpetrated by "threats, intimidation, or coercion" as required under Massachusetts law. See, e.g., ___ ____ Planned Parenthood League v. Blake, 631 N.E.2d 985, 990 ___________________________ _____ (Mass. 1994). The Supreme Judicial Court has accepted that a "threat" may be defined as an "exertion of pressure to make another fearful or apprehensive of injury or harm"; that "intimidation" may be defined as "putting [a person] in fear for the purpose of compelling or deterring conduct"; and that "coercion" may be defined as the application of physical or moral force so as to force someone to do something she would otherwise not have done. Id. On the facts here, a jury ___ could find that Officer Hayes used the strip search to humiliate or punish Swain and as a means of exerting moral or psychological pressure designed to weaken her perceived -32- 32 resistance to her questioning. This could indeed constitute "intimidation" or "coercion" within the meaning of the statute. The judgment of the court below is affirmed with affirmed ________ respect to the Town of North Reading, and reversed with reversed ________ respect to the individual defendants. -33- 33