# United States Court of Appeals
## For the First Circuit

No. 19-1950

UNITED STATES OF AMERICA,

Appellee,

v.

ANDRES PEREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Daniel J. Cloherty, by appointment of the Court, with whom
Maria Davis and Todd & Weld LLP were on brief, for appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom Andrew E. Lelling, United States Attorney, was on brief,
for appellee.

October 9, 2020

**LYNCH**, **Circuit Judge**.   The defendant, Andres Perez, appeals from the district court's denial of a motion to suppress drug evidence which was seized without a warrant as a result of an automobile stop and drug evidence from a subsequent visual body cavity search conducted at the Revere police station.   The defendant argues that the police officers lacked reasonable suspicion to perform the initial stop of his vehicle and the requisite level of suspicion to perform the visual body cavity search of his person and so violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution.   We hold that the facts establish that the police had reasonable suspicion to perform the automobile stop and particularized reasonable suspicion to perform the visual body cavity search.   We affirm.

I.

A.   Facts

On the morning of October 31, 2017, Lieutenant Maria Lavita and Detective Douglas Zingali of the Revere Police Department were driving in an unmarked police cruiser through Revere, Massachusetts.   Lt. Lavita had twenty-two years of experience with the Revere Police Department, including experience with drug distribution crimes and undercover drug buys during her years as a detective.   She was also the head of the Criminal Investigation Division at the Revere Police Department, which

included the drug crime unit. Det. Zingali had twenty-one years of experience with the Revere Police Department, including six years as a detective.

As the officers were driving south on a residential street near Route 1A, they observed a white male pacing back and forth along the street and talking on a cell phone. The officers' attention was drawn to the unidentified man because they believed he was inappropriately dressed in shorts and a T-shirt given the cool weather and time of year. The officers testified that the man appeared agitated and kept looking down the side streets as though he was waiting for somebody or giving directions.

The officers observed the man turn hurriedly onto one of the side streets. They saw the man lean into the passenger side window of a parked brown Mercedes for no more than fifteen seconds and then walk away. The officers could not see whether anything was exchanged between the man and the vehicle's occupants, nor could they see anything in the man's hands as he walked away from the Mercedes. But based on their training and experience, the officers believed that a street-level drug transaction had just transpired.

The Mercedes immediately drove off as the man walked away and the officers decided to follow the vehicle. As the officers followed in their unmarked cruiser, the Mercedes made a series of turns onto various streets until the vehicle had

basically traveled in a circle. This unusual route, together with the vehicle's strict adherence to the motor vehicle laws, led the officers to believe that the driver of the Mercedes was aware that he was being followed by police. The officers activated their lights and sirens and the Mercedes pulled over into a residential driveway.

The officers parked behind the Mercedes and got out of the cruiser. As they approached the Mercedes, the officers saw the driver and passenger exchange cell phones in the vehicle. Det. Zingali approached the driver's side and asked the driver for his license and registration, while Lt. Lavita approached the passenger's side to speak to the passenger. The driver, who identified himself as Andres Perez, provided the vehicle registration and stated that he did not have his license with him. Det. Zingali asked Perez why he had pulled into the driveway, and Perez answered that he was visiting a friend at that house and provided a name for the "friend."

The officers radioed the dispatch center to request the status of Perez's license and registration. The dispatch center informed them that Perez's license had been revoked. The officers called for a marked police cruiser to place Perez under arrest for operating after revocation. When the marked cruiser arrived, Det. Zingali ordered Perez out of the Mercedes and Det. Zingali conducted a pat frisk of Perez. Det. Zingali discovered some money

and other items but found no weapons or drugs from the pat frisk. As that was happening, the passenger, Cesar Alicea, suddenly jumped out of the passenger side of the vehicle and fled. Lt. Lavita and one of the officers who had arrived in the marked cruiser pursued Alicea on foot while Det. Zingali handcuffed Perez and placed him in the back of the marked cruiser. As they were running, the backup officer saw Alicea reach into his waistband and toss an object over a fence into a residential backyard. The officer placed Alicea under arrest.

Detective Lieutenant Robert Impemba arrived to help the officers search for the object that Alicea had thrown over the fence. Lt. Impemba was a supervisor of the Narcotics and Gang Unit of the Revere Police Department and was also a task force officer assigned to the FBI North Shore Gang Task Force, with about ten years of experience in gang and drug investigations. Lt. Impemba recovered a loaded semiautomatic firearm and ammunition from a garden in one of the yards near where Alicea had thrown the object. The condition of the soil and the gun indicated that the gun had not been there very long.

After Alicea had been arrested and the firearm recovered, the other officers returned to the Mercedes. Lt. Impemba saw Perez in the back of the marked cruiser and recognized him from a previous drug investigation. Lt. Impemba had arrested Perez for distribution of crack cocaine and heroin after undercover

purchases had been made from him on numerous occasions. Lt. Impemba also knew Perez to be an affiliate of the drug-distributing East Side Money Gang out of Chelsea, Massachusetts.

Perez and Alicea were transported to the Revere police station for booking while Lt. Lavita and Det. Zingali awaited the arrival of a K-9 narcotics dog to search the Mercedes for evidence of drug distribution. During that vehicle search, the officers recovered a small, clear plastic baggie containing a white, rock-like substance from the floor between the driver's side door and seat. The officers believed the white substance to be crack cocaine. Lt. Impemba testified that, based on the single distribution-size baggie recovered from the vehicle and his experience, Perez likely would have been carrying numerous baggies packaged for distribution. The parties agree that three cell phones were also recovered during the search of the vehicle. The officers discovered a revoked license plate in the trunk of the Mercedes.

Lt. Impemba booked Perez at the Revere police station with Det. Zingali and one other uniformed officer present. During the booking process, $269 in various denominations were removed from Perez's pocket. Lt. Impemba testified that the amount of money in various denominations was consistent with street-level drug distribution. Lt. Impemba informed Det. Zingali of Perez's arrest history for narcotics distribution. Based on the

information that Perez was a known drug dealer, Det. Zingali's belief that he and Lt. Lavita had witnessed a drug transaction, the single small baggie of suspected drugs found on the driver's side of the Mercedes in between the driver's seat and door, the money found on Perez, the fact that no other drugs were discovered from the pat down of Perez, and their experience and training, Lt. Impemba and Det. Zingali concluded that Perez was likely concealing more drugs on his body. They decided that a strip search and a visual body cavity search were necessary to recover those drugs.

Perez was instructed to pull down his pants and underwear and to bend over at the waist. After initial hesitation, Perez bent over and Det. Zingali lowered himself and looked up towards Perez's buttocks. Det. Zingali saw a clear plastic baggie protruding from between Perez's buttocks and removed the baggie with a gloved hand. The plastic bag was found to contain ten smaller plastic baggies of crack cocaine and three smaller plastic baggies of heroin. The strip search and visual body cavity search were not performed pursuant to a standard written policy of the Revere Police Department.

B.   Procedural History

Perez was indicted on one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). On July 11, 2018, Perez filed a motion to suppress all evidence obtained from the warrantless stop and search of the Mercedes and

- 7 -

the warrantless strip search and visual body cavity search. The district court held a hearing on the motion to suppress on October 31, 2018, and issued a memorandum and order denying that motion on January 11, 2019. United States v. Perez, Criminal Action No. 17-10391-RGS, 2019 WL 181283, at *5 (D. Mass. Jan. 11, 2019).

The district court held that, based on the officers' observations and experience, they had reasonable suspicion to conduct the initial stop of Perez's vehicle. Id. at *4. Specifically, the court found that the following observations reasonably supported an inference that a drug transaction had taken place: (1) "an agitated man inappropriately dressed for the weather pacing on a public street while speaking on a cellular phone"; (2) that same man "after several minutes of pacing and talking, walked around the street corner where he approached a Mercedes vehicle idling in the middle of the street, having come from the direction of Route 1A"; (3) "th[at] man then leaned into the passenger window for 10 or 15 seconds and then walked away"; and (4) "the unusual and circuitous route that the Mercedes took while driving away from the scene, a route that an experienced officer would have recognized as consistent with counter surveillance and/or an attempt to evade police." Id. The court also held that Perez's arrest and the search of the Mercedes were lawful. Id. at *4-5.

With respect to the strip and visual body cavity searches, the district court first cited Bell v. Wolfish, 441 U.S.

520 (1979), for the proposition that "[s]earches of persons <u>jailed</u> after arrest, including strip searches and visual body cavity searches, may be conducted with less than probable cause if the search is reasonable in scope, manner, and purpose." <u>Perez</u>, 2019 WL 181283, at *4 (emphasis added) (citing <u>Wolfish</u>, 441 U.S. at 558-60). Neither party had cited <u>Wolfish</u> for that precise proposition in their briefs to the district court. The district court then cited our decision in <u>Swain</u> v. <u>Spinney</u>, 117 F.3d 1 (1st Cir. 1997), for the proposition that to be reasonable under <u>Wolfish</u>, "strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." <u>Perez</u>, 2019 WL 181283, at *4 (quoting <u>Swain</u>, 117 F.3d at 7).

> Ultimately, the district court held that
>
> [t]he search of Perez incident to booking was lawful, including the strip and visual body cavity search of his person . . . [because] [a] detainee who is jailed pursuant to a valid arrest, regardless of the nature or degree of the crime, may be subjected to a visual body cavity search on reasonable suspicion (or less).

<u>Id.</u> at *5 (citing <u>Florence</u> v. <u>Bd. of Chosen Freeholders</u>, 566 U.S. 318, 336-38 (2012)). The district court cited this rule even though neither party had cited <u>Florence</u> to the court and the government had never argued that a standard less than particularized reasonable suspicion should apply. Rather, the

government had argued only that the booking officers had particularized reasonable suspicion to justify the search.

Perez entered a conditional plea agreement, reserving his right to challenge the district court's denial of his motion to suppress, and he was sentenced to seventy-two months' imprisonment. He timely appealed.

## II.

On appeal, Perez challenges only whether the officers had reasonable suspicion to perform the automobile stop and particularized reasonable suspicion to perform the visual body cavity search. He does not assert that the search of his vehicle, once stopped, was unlawful or that the scope or manner of the visual body cavity search was overly intrusive.

In reviewing the denial of a motion to suppress, we evaluate legal conclusions de novo and findings of fact for clear error. United States v. McGregor, 650 F.3d 813, 819-20 (1st Cir. 2011). We assess the record evidence in the light most favorable to the suppression ruling. United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014). We need not rely solely on the district court's reasoning and may affirm a suppression ruling on any basis apparent in the record. Id.; see also United States v. Adams, 971 F.3d 22, 31 (1st Cir. 2020) ("[W]e construe the record in the light most congenial to the district court's ruling and will affirm the court's denial of a suppression motion 'as long as that denial is

- 10 -

supported by any particularized and objectively reasonable view of the evidence.'" (quoting United States v. Tanguay, 811 F.3d 78, 81 (1st Cir. 2016))).

A.    The Officers Had Reasonable Suspicion to Stop Perez's Vehicle

Perez argues that Lt. Lavita and Det. Zingali may have had a "hunch" that criminal activity had taken place, but that they lacked the reasonable suspicion necessary to stop Perez's vehicle.  A police officer can conduct a brief investigatory stop of a person or vehicle where the officer has a reasonable suspicion that criminal activity is afoot.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  A reviewing court must consider the "totality of the circumstances" in determining whether the officer had a particularized and objective basis for suspecting criminal activity, which may include inferences drawn from the officer's specialized training and experience.  Id.; see also United States v. Dubose, 579 F.3d 117, 121-22 (1st Cir. 2009).

We agree that the officers' observations of the activities of both the man and the Mercedes and its passengers justified the stop of Perez's vehicle.  Lt. Lavita and Det. Zingali observed a man inappropriately dressed for the weather pacing back and forth and looking up and down various streets while on a cell phone, before finally rushing towards an arriving vehicle.  Those observations could support an inference that this was a planned meeting.  That, together with the nature of the man's brief

- 11 -

interaction with the occupants of the Mercedes, could reasonably have led Lt. Lavita and Det. Zingali, who both had extensive training and experience in narcotics distribution, to conclude that a street-level drug transaction had just occurred. See Dubose, 579 F.3d at 121-22 (finding reasonable suspicion of a drug transaction based on the brief nature of the interaction between the defendant and the occupants of the vehicle, the fact that the defendant leaned his body into the vehicle during the interaction, the fact that the defendant's conduct was similar to conduct in other drug transactions in the area, and the expertise of the observing officer); United States v. Trullo, 809 F.2d 108, 112 (1st Cir. 1987).

The officers' reasonable suspicion of criminal activity was further supported by the strange and circuitous route the Mercedes took once the unmarked cruiser began to follow, which reasonably led Lt. Lavita and Det. Zingali to believe that the driver was attempting to evade police surveillance. See Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (stating that the defendant's "strange movements in his attempt to evade the officers [inside the airport] aroused further justifiable suspicion" for the stop); United States v. Vargas, 633 F.2d 891, 893, 895-96 (1st Cir. 1980) (finding reasonable suspicion to justify an automobile stop based, in part, on the vehicle's "seemingly evasive driving pattern").

B.   The Officers Had Particularized Reasonable Suspicion to
     Conduct the Visual Body Cavity Search

          Perez also argues that the district court erred in

finding that the visual body cavity search was permissible.  Perez

argues that the district court erred in applying the Supreme

Court's decision in Florence to the context of an arrestee being

booked in a police station.[1]  See 566 U.S. at 325, 333-34, 338;

see also Wolfish, 441 U.S. at 558-60.

          This case was never presented to the district court as

one involving the rule of Florence and Wolfish.  Indeed, the

government never even cited Florence in its briefs to the district

court, but rather relied solely on the particularized reasonable

suspicion standard from United States v. Barnes, 506 F.3d 58 (1st

Cir. 2007), and Swain to justify the visual body cavity search.[2]

No evidence relevant to whether the rule of Florence and Wolfish

---

          [1]    Florence and Wolfish were both decided in the specific
context of detention facilities, such as prisons or jails, in which
correctional officers conducted suspicionless searches, pursuant
to a standard policy, of all detainees entering or reentering the
general population and which were motivated by the special safety
and security concerns that inhere to those facilities.   See
Florence, 566 U.S. at 322-23, 325-28, 330-38; Wolfish, 441 U.S. at
546-48, 558-60.

          [2]    The government does not dispute that the search here
involved a visual body cavity search, rather than a mere strip
search.  See Barnes, 506 F.3d at 62 (distinguishing the level of
particularized suspicion necessary for a visual body cavity search
from that necessary for a less-intrusive strip search).  We accept
the parties' characterization of this search as involving a visual
body cavity search.

applies in this context was ever presented to the district court, such as the conditions of the holding cells or the particular safety or security concerns at the Revere police station. The district court simply cited Florence without explaining why it applies to the circumstances of this case. See Perez, 2019 WL 181283, at *4-5. That was error.[3]

Nonetheless, the parties agree that we can decide the particularized reasonable suspicion issue on this record applying our decisions in Barnes and Swain. See Barnes, 506 F.3d at 62; Swain, 117 F.3d at 7.[4] In Barnes, we reaffirmed that "the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context" and "[t]he suspicion must be specific to the individual being searched." 506 F.3d at 62 (alteration omitted) (first quoting Swain, 117 F.3d at 7; then citing Roberts v. Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001));

---

[3] On appeal, the government does not defend the visual body cavity search on Florence grounds, but rather focuses its arguments on whether the visual body cavity search was justified by particularized reasonable suspicion.

[4] The district court did not cite Barnes anywhere in its opinion, nor did it cite Swain's reasonable suspicion standard in the portion of its opinion deciding the permissibility of the strip and visual body cavity search of Perez. Perez, 2019 WL 181283, at *5. Rather, it merely cited Florence for the broader rule that the visual body cavity search of Perez could be justified on reasonable suspicion or less. Id. The district court thus failed to analyze specifically whether the officers had particularized reasonable suspicion to conduct the visual body cavity search of Perez under Barnes.

see also id. (holding that because "a visual body cavity search involves a greater intrusion into personal privacy[,] . . . prior to conducting a visual body cavity search, we require a more particularized suspicion that contraband is concealed").[5]

Lt. Impemba and Det. Zingali were aware that Perez was a known drug dealer, and Lt. Impemba had personally been involved in the investigation and arrest of Perez for narcotics distribution.  A small baggie appearing to contain crack cocaine and sized for an individual sale was found on the floor between the driver's seat and the driver's side door.  Based on their training and experience, it was reasonable for the officers to believe that Perez had more than that single distribution-size baggie and, given that the search of the vehicle and the pat frisk did not turn up any more drugs, they were likely concealed on his body.  It was also reasonable for the officers to conclude that Perez had dropped the baggie on the driver's side floor while attempting to conceal drugs on his body.  We have recognized before the propensity for drug dealers to hide bags of drugs under their clothing.  See United States v. Rasberry, 882 F.3d 241, 250 (1st

---

[5]     The particularized reasonable suspicion standard of Barnes does not require particularized reasonable suspicion that weapons or contraband are to be found in a specific body cavity as opposed to other body cavities.  See Barnes, 506 F.3d at 62 (stating that "prior to conducting a visual body cavity search, we require a more particularized suspicion that contraband is concealed," but not stating that the suspicion must be with respect to a specific body cavity).

Cir. 2018) ("This suspicion [that the defendant was concealing drugs in his underwear] was heightened by [the officer]'s knowledge that drug dealers frequently conceal drugs in their undergarments."); United States v. Cofield, 391 F.3d 334, 337 n.2 (1st Cir. 2004) (noting that, in discussing the reasonableness of a strip search, "[i]t is common knowledge that controlled substances often are concealed on the person of users and dealers alike" (alteration in original) (quoting Burns v. Loranger, 907 F.2d 233, 238-39 (1st Cir. 1990))). Perez was found with a few hundred dollars, several cell phones in the vehicle, and a passenger carrying a firearm with an obliterated serial number, all of which were also indicative of street-level drug dealing and reaffirmed the suspicion that Perez likely had more drugs concealed.

Moreover, Perez had driven in an evasive manner while being followed by police, Perez and Alicea had been observed quickly exchanging cell phones as the officers approached the Mercedes, and Perez's passenger had fled the scene while attempting to discard a firearm, all of which supported reasonable suspicion of attempts to conceal evidence of criminal activity. Taking the booking officers' observations, knowledge, and experience collectively, it is apparent from the record that they collectively had particularized reasonable suspicion to justify the visual body cavity search for drugs. See Barnes, 506 F.3d at 62 (explaining

- 16 -

that reasonable suspicion can be established by the "collective knowledge" of the officers involved in the investigation).

It is true that in Barnes we held that the government had not shown adequate evidence that the officers had particularized reasonable suspicion to conduct a visual body cavity search, despite a tip from an informant that the defendant was known to conceal drugs between his buttocks. Id. at 63-64 (remanding to determine whether the informant's tip had sufficient indicia of reliability to support particularized reasonable suspicion). Perez argues that because the booking officers here lacked even a tip or other information indicating that Perez had a reputation for concealing drugs in his buttocks, they could not possibly have had the sort of particularized and individualized suspicion necessary for a visual body cavity search. He also argues that under Barnes, particularized reasonable suspicion for a visual body cavity search is not satisfied by the mere fact that the arrestee has a history of drug-related offenses or that some drugs were found in the vehicle the arrestee was driving.

To the extent that Perez suggests officers can establish particularized reasonable suspicion only where they have a tip or other information indicating that the suspect has a reputation for concealing drugs in his buttocks, that argument is wrong. A determination of particularized reasonable suspicion is based on the totality of the circumstances known to the investigating

- 17 -

officers at the time of the search, and our cases establish that this determination must be made on a case-by-case basis. See Barnes, 506 F.3d at 62 ("[I]n evaluating whether the suspicion was reasonable, we 'look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" (second alteration in original) (emphasis added) (quoting Arvizu, 534 U.S. at 273)); see also Rasberry, 882 F.3d at 250-51 (focusing on the particular facts of the case); Swain, 117 F.3d at 7-9 (same).

There are facts here that were not present in Barnes, including the presence of a distribution-size baggie of suspected drugs on the floor next to the driver's seat and the indications that Perez and his passenger were attempting to conceal evidence, which support a particularized and individualized suspicion that Perez was concealing more drugs on his body. Cf. Barnes, 506 F.3d at 60 (explaining that the officers discovered a large bag of marijuana and small bag of marijuana in the trunk of the vehicle, but no bags of drugs in the driver's compartment and reciting no facts indicating an attempt to conceal evidence). The officers were not relying solely on the mere presence of suspected drugs in the vehicle or Perez's history of drug dealing to justify the visual body cavity search. Once the officers had particularized reasonable suspicion that Perez was concealing drugs on his body, they were not required to have a more particularized suspicion

- 18 -

that Perez was or had a reputation for concealing drugs in his buttocks or some other specific body area.  See id. at 62.

### III.

We affirm the district court's denial of Perez's motion to suppress, but as to the visual body cavity search, we do so for reasons different than the district court.

Affirmed.

**-Concurring Opinion Follows-**

**TORRUELLA**, **Circuit Judge** (Concurring).  I write separately to emphasize "the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities."  Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. 1985) (quoting Arruda v. Fair, 710 F.2d 886, 887 (1st Cir. 1983)); see also Roberts v. Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001) ("[W]e consider such searches an 'extreme intrusion' on personal privacy and 'an offense to the dignity of the individual.'" (quoting Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996))).  "Even when carried out in a respectful manner, and even absent any physical touching, such searches are inherently harmful, humiliating, and degrading."  Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 345 (2012) (Breyer, J., dissenting) (citation omitted); see id. at 341 (Alito, J., concurring) (describing strip and body cavity searches as "undoubtedly humiliating and deeply offensive to many").  Accordingly, we have required "a more particularized suspicion that contraband is concealed" for body cavity searches than for strip searches.  United States v. Barnes, 506 F.3d 58, 62 (1st Cir. 2007); see Florence, 566 U.S. at 343 (Breyer, J., dissenting) (explaining that searches involving "close observation of the private areas of a person's body . . . constitute a far more serious invasion of that person's privacy" than do searches involving that person "undressing and taking a shower" under supervision).

- 20 -

"[W]hen 'privacy-related concerns are weighty enough' a 'search may require a warrant, notwithstanding the diminished expectations of privacy of [an] arrestee.'" Riley v. California, 573 U.S. 373, 392 (2014) (quoting Maryland v. King, 569 U.S. 435, 463 (2013)). Given the intrusiveness of body cavity searches, absent exigency, I believe a judicial order ought to be obtained before such searches are conducted. See Birchfield v. North Dakota, 136 S. Ct. 2160, 2187 (2016) (Sotomayor, J., concurring in part) ("Both before and after a person has been arrested, warrants are the usual safeguard against unreasonable searches . . . ."); cf. Florence, 566 U.S. at 342 (Alito, J., concurring) ("The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer."); id. at 354-55 (Breyer, J., dissenting) (noting the same).

Nevertheless, because the majority's decision comports with our precedent that "the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context," Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997), and that the circumstances of this case provide particularized reasonable suspicion, see Barnes, 506 F.3d at 62-64, I join the decision.