**Craig L. ROBERTS, Sr., individually and on behalf of a class of persons similarly situated,**

v.

**The State of RHODE ISLAND, and George A. Vose, Jr., individually and in his capacity as Director of the R.I. Department of Corrections, and Roberta Richmond, individually and in her capacity as the Warden of The Women's Facility at the Adult Correctional Institutions, and Albert Gardiner, individually and as Warden of the Intake Services Center at the Adult Correctional Institution,**

**and**

**Craig L. Roberts, Sr., individually,**

v.

**Two Unknown Rhode Island State Troopers whose names will become known in the course of pretrial discovery.**

No. 99–259ML.

United States District Court, D. Rhode Island.

March 16, 2000.

Opinion Amending Decision, March 24, 2000.

Thomas W. Kelly, Newport, RI, Gregory A. Belzley, Frost Brown Todd, LLC, Louisville, KY, for plaintiff.

Rebecca Tedford Partington, Attorney General's Office, Providence, RI, for defendants.

## MEMORANDUM AND DECISION

LISI, District Judge.

This case is before the Court on the parties' cross-motions for summary judgment. The plaintiff has moved for partial summary judgment as to the issue of liability on Counts One and Two of his First Amended Complaint. The State has also moved for summary judgment. For the reasons stated herein, the Court grants

the plaintiff's motion and denies the defendants' motion.

## I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant, and a fact is "material" if it has the potential to sway the outcome of the litigation under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the parties have filed cross-motions for summary judgment, the standard of review does not buckle. *See Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996)("The happenstance that both parties move simultaneously for *brevis* disposition does not, in and of itself, relax the taut line of inquiry that Rule 56 imposes."). The trial court must consider each motion separately, viewing the facts and drawing all inferences in a light that is most favorable to the non-movant. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997).

## II. Undisputed Facts [1]

### A. The Searches

In the early morning hours of April 20, 1999, the plaintiff, Craig Roberts ("Roberts"), was a passenger in a vehicle driven by an individual named Steven Rizzo ("Rizzo"). State police troopers John Gibbs and John Allen stopped the vehicle on Bellevue Avenue in Newport, Rhode Island, because the registration stickers on its license plate had expired. The troopers checked the occupants' identification, and allowed the vehicle to pull away after Rizzo produced the proper registration stickers.

As the vehicle pulled away, the troopers stopped it again and asked Roberts to exit the car. The troopers advised Roberts that the computer had revealed that he was subject to an outstanding body attachment.[2] The troopers performed a patdown frisk, which revealed no weapons, and placed Roberts in the back of the cruiser. Roberts then produced a carbon-copy of a family court order issued by magistrate George DiMuro, dated September 1, 1998, withdrawing the body attachment. After relaying this information to dispatch, the troopers declined to release Roberts and transported him to the Intake Services Center ("ISC") at the Adult Correctional Institution ("ACI") in Cranston, Rhode Island.

Upon arriving at the ISC, the troopers transferred Roberts to the correctional officer on duty. He was placed in a temporary holding cell and the committing officer completed a "New Inmate Committing Sheet." The officer photographed Roberts, took his fingerprints, and requested that he submit to a blood test. Roberts refused the blood test.

---

1. In support of their motions for summary judgment, the parties submitted a joint factual stipulation pursuant to D.R.I. Loc. R. 12.1. Unless otherwise stated, the Court draws the relevant facts from that document and the exhibits that accompany it.

2. Pursuant to R.I. Gen. Laws § 8–10–3.1(c)(8), a duly appointed master of the family court has the power to issue a "capias and/or body attachment." Black's Law Dictionary defines the term "capias," also termed "body execution," as "[a]ny of various types of writs that require an officer to take a named defendant into custody." Black's Law Dictionary 199 (7th ed.1999).

At some point during the committing procedure, a member or members of the ISC staff subjected Roberts to a strip search in accordance with two policies promulgated by the Department of Corrections ("DOC"). Pursuant to those policies, Roberts was told to remove his clothing one item at a time for inspection. The member or members of the ISC staff completed a "Scars and Tattoo Sheet." The ISC staff member or members ordered Roberts to run his fingers through his hair. They then inspected the inside of his mouth, the inside of his nose, his hands, and his feet. Roberts was also ordered to spread his buttocks, whereupon the officer or officers visually inspected his body cavity. Noone touched Roberts during the course of the search. The ISC staff member or members then gave Roberts prison garments and placed him in a segregated cell because he had refused the blood test.

The ISC staff subjected Roberts to a similar search before transporting him to the Garrahy Judicial Complex later that morning. It is unclear from the deposition transcripts and Rule 12.1 submissions whether the area in which Roberts was searched was secluded from public view, although Roberts's deposition does suggest that another individual was next to him during the second strip search procedure. After showing the carbon-copy of the order withdrawing the body attachment to a sheriff in the Garrahy Complex, Roberts was released from custody. He was not presented before a judicial officer.

**B. The Policies**

There are two policies in issue in this case, both of which were in effect at the time of Roberts's search. The first policy, dated June 15, 1984, is located in a DOC "Operational Memorandum" numbered 5.15.05–2. The subject of the memorandum is the "Reception and Identification for Awaiting Trial and Newly Sentenced Inmates." Part V.B. of that policy provides as follows:

**B. *SEARCH OF INMATE AND BELONGINGS:***

Each new commitment's person, clothing, and personal belongings shall be thoroughly searched for contraband.

1. The commitment officer shall thoroughly search the inmate's body to include examination of hair, arms, hands, ears, mouth, nose; visual examination of groin and rectum; toes and soles of feet.

   (a) Any artificial limbs, dentures, or bandages shall be carefully examined.

2. The new commitment's clothing and belongings shall be thoroughly searched to include examination of all pockets, cuffs, seams, hat bands, waistbands, zippers, and collars; all clothing shall be turned inside-out and linings checked; soles, heels, socks, and inside of all shoes shall be examined; the contents of any and all luggage, packages, bags, etc. shall be thoroughly examined.

The second policy in issue derives from a DOC "Policy and Procedure" dated January 27, 1997, numbered 9.14–1. The subject of the memorandum is "Procedures for Detecting and Controlling Contraband On or In the Possession of Inmates." Part III.B.2. of that policy provides as follows:

2. *Strip Searches*

a. Strip searches of inmates will always be conducted for objective purposes only and will always be carried out in an expeditious and efficient manner. They will never be done for punitive purposes or as a form of harassment.

(1) Strip searches shall be conducted under the direction of the Shift Super-

visor or other Superior Officer, or as required by policy.

(2) Two (2) Correctional Officers shall be assigned to conduct a strip search.

(3) Strip searches shall be conducted by officers of the same sex as the inmates being searched, except during emergencies.

(4) The following search plan shall be followed when conducting a strip search. The officer will examine:

(a) All pockets;

(b) Run fingers over linings, seams, collars, cuffs, waistbands, and fly;

(c) Shoes, inside soles and heels;

(d) Socks, turning them inside out;

(e) False teeth, artificial limbs, plaster casts;

(f) Inmates will run their fingers through their hair. Officers will check for wigs and hairpieces;

(g) Inmates ears will be checked inside and out;

(h) The officer will look inside the inmate's nose;

(i) Inmates will open their mouths, lift their tongues and roll each lip, for the officer's view;

(j) Inmates will lift their penises and testicles on the officer's command to provide a clear view of the groin area;

(k) Inmates will then lift their feet so that the officer can clearly see between the toes and the soles;

(l) Inmate's hands will be visually inspected;

(m) Inmates will be required to bend over and spread the rectum to provide a clear view of the area.

Roberts's summary judgment motion asks this Court to declare these policies unconstitutional; the state seeks precisely the opposite.

C. The ISC [3]

The DOC operates the ACI, which currently consists of seven facilities with a total capacity of 3,858 beds. One of the seven facilities that the DOC operates is the ISC. The ISC serves as the receiving facility for all males committed to the care, custody, and control of the DOC. The Rhode Island State Police, sheriffs, local police departments, United States Marshals Service, and the Immigration and Naturalization Service all bring commitments to the ISC.

Commitments housed at the ISC fall into several categories. Some are pretrial detainees, some are newly sentenced inmates who await classification to other facilities, some are pretrial protective custody detainees, and others are sentenced protective custody inmates. The length of time an inmate remains committed to the ISC is approximately 16.8 days.

It is a standard policy at the ISC to strip search each male processed as a commitment. Nevertheless, if someone bails a commitment out of the facility within a very short [4] period of time, he does not enter the general population and is not subjected to the routine strip search. The correctional officers at the ISC search inmates in accordance with the aforementioned DOC policies. Those offi-

---

**3.** The Court draws the following facts from the affidavit of A.T Wall II ("Wall") and the documentation that accompanied it. At the time of the filing, Wall was Interim Director of the DOC. The defendants submitted his affidavit in support of their motion for summary judgment.

**4.** Neither policy in issue defines a "very short" period of time.

cers receive training about the strip search procedure in video and lecture form.

Rhode Island has a unified prison system. This means that there are no regional facilities to house pretrial detainees before they are tried and sentenced. The ISC is, therefore, considered a maximum security prison. The affidavit suggests that the strip search policies ensure the facility's security, which consists of an integrated general population. The ISC's commitments are out of their cells for approximately eight hours each day, during which time they commingle with the other commitments in different areas of the facility. The strip searches have resulted in the discovery of contraband in the past. Although none of the incident reports supplied by the defendants indicates that contraband was found during visual body cavity searches, one report did discuss an inmate who had secreted cocaine in a plastic bag in his mouth. The strip search of Roberts yielded no weapons or contraband.

### III. Discussion

The question that this Court must answer is whether the DOC's policies requiring all of the ISC's commitments to undergo a visual strip and body cavity search[5] comports with the Fourth Amendment's prohibition against unreasonable searches. Upon careful review of the stipulated facts and relevant policies, the Court finds those policies to be unconstitutional.

Any analysis of the policies in issue necessarily begins with *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In that case, the Supreme Court of the United States considered whether a policy requiring pretrial detainees at a federal detention facility to expose their body cavities to visual inspection after contact visits with persons outside the institution was constitutional. *Id.* at 558, 99 S.Ct. 1861. In holding that the policy did not violate the petitioners' Fourth Amendment rights, the Supreme Court defined the parameters of the reasonableness inquiry in these kinds of cases:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. 1861.

Since the Court's decision in *Wolfish*, the courts of appeals have addressed myriad strip search policies applied to arrestees and detainees. *See, e.g., Weber v. Dell*, 804 F.2d 796 (2d Cir.1986)(holding unconstitutional blanket jail policy of subjecting all arrestees to strip and visual body cavity searches); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983)(holding unconstitutional city policy of subjecting all females arrested and detained to strip and visual body cavity

---

**5.** In support of their motion for summary judgment, the defendants seek to classify the searches in question as strip searches. Clearly, the searches in issue involved visual body cavity searches as well. As the court of appeals noted in *Blackburn v. Snow*, 771 F.2d 556, 561 n. 3 (1st Cir.1985):

> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

searches); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981)(finding policy to strip search all detainees for weapons or contraband unconstitutional). *But see, e.g., Dobrowolskyj v. Jefferson County, Ky.,* 823 F.2d 955 (6th Cir.1987)(upholding as constitutional strip search policy requiring strip and visual body cavity search of all inmates being moved from one security area of a prison to another). The United States Court of Appeals for the First Circuit has also addressed a similar policy.

In *Arruda v. Fair,* 710 F.2d 886 (1st Cir.1983), the court of appeals considered a strip search policy that provided for routine strip searches of certain maximum security inmates after the inmates had left the prison law library and infirmary, and after they had received visitors in the maximum security unit's visiting rooms. Recognizing the "severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities," a divided court of appeals upheld the policy in question due in large part to the nature of the facility and the "particularly dangerous prisoners" confined therein. *Id.* at 887 (noting that 83% of inmates confined to the facility "were serving maximum sentences of more than 10 years").

Almost fourteen years after *Arruda,* the court of appeals revisited *Bell* in *Swain v. Spinney,* 117 F.3d 1 (1st Cir.1997). In *Swain,* the court addressed anew the standard set forth in *Wolfish.* Noting that other courts of appeals had concluded that "to be reasonable under *Wolfish,* strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons," the First Circuit adopted the reasonable suspicion standard as well. *Id.* at 7 ("Accordingly, it is clear that at least the reasonable suspicion standard governs strip and visual body cavity searches in the

arrestee context as well."). *See also Weber,* 804 F.2d at 802 (adopting reasonable suspicion standard), *quoted in Wachtler v. County of Herkimer,* 35 F.3d 77, 81 (2d Cir.1994).

The facts in *Swain* were different from the facts in the case now under consideration. In *Swain,* 117 F.3d at 1, police officers arrested the plaintiff ("Swain") and her boyfriend for possession of marijuana and theft. Police pat-frisked the plaintiff at the scene and then transported her and her boyfriend to the police station. Swain was taken to a booking area and her information was processed by a female employee. During the booking process, Swain was permitted to use the bathroom unobserved. She then made a telephone call to her lawyer. Upon concluding the conversation, she was again pat-frisked and placed in a holding cell. *Id.* at 3.

Swain was in the cell for approximately twenty minutes when a male officer entered the cell to interrogate her about her boyfriend's criminal activities. The officer became angry when Swain insisted that she knew nothing about those activities. The officer then departed. Five to ten minutes later, a female employee of the department entered the cell and informed Swain that she would have to submit to a strip search. The subsequent strip and visual body cavity search revealed no contraband or weapons. *Id.* at 3–4.

■ Although the facts of *Swain* are different from the facts in the case at bar, this Court must adhere to the standard propounded by the court of appeals. To pass muster under that standard, a strip and visual body cavity conducted in this circuit must be based at least upon a reasonable suspicion that the arrestee is concealing contraband or weapons.

Even the most cursory glance at the policies propounded by the DOC for use at

the ISC indicates that they are constitutionally deficient. Policy number 5.15.05–2, the policy that governs the admission of new commitments to the ISC, contains no language concerning what factors might give rise to the reasonable suspicion that would permit a constitutional strip and visual body cavity search. Policy number 9.14–1 states that strip searches for controlling contraband in the facility shall "be conducted for objective purposes only." Nevertheless, it does not provide any guideposts respecting which objective criteria might give rise to reasonable suspicion, which would permit a constitutional strip and visual body cavity search. *See, e.g., Weber,* 804 F.2d at 802 (dicta suggesting that particularized suspicion might arise from the nature of the charge and the specific circumstances surrounding the arrest); *Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983)(holding strip search constitutional where police arrested the plaintiff for felonious assault); *Logan,* 660 F.2d at 1013 (finding blanket search policy unconstitutional as applied to plaintiff where, *inter alia,* offense of drunken driving was "one not commonly associated by its very nature with the possession of weapons or contraband"). In fact, the policies evidence no exceptions to the firm rule that all commitments to the ISC are to be subjected to a strip and visual body cavity search.

While this Court is mindful of the DOC's need to implement and maintain policies that will promote order within the ACI and particularly the ISC, the Court is also aware of "the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities." *Arruda,* 710 F.2d at 887. As the United States Court of Appeals for the Fourth Circuit admonished in *Logan,* 660 F.2d at 1013: "An indiscriminate strip search policy routinely applied to detainees such as [Roberts] along with all other de-

tainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations." Thus, while some strip and visual body cavity searches at the ISC will, no doubt, be constitutionally permissible, the current indiscriminate practice of subjecting all commitments to those searches cannot pass Fourth Amendment scrutiny.

Based upon the stipulated statement of facts, the facts submitted by the defendants in support of their motion for summary judgment, and a careful survey of the precedential landscape, this Court concludes that DOC policies 5.15.05–2 and 9.14.1 do not comport with *Swain*'s reasonable suspicion standard and are therefore unconstitutional. In light of this determination, the Court also concludes that those policies, as applied to Roberts, violated his right to be free from an unreasonable search in violation of 42 U.S.C. § 1983.

## IV.  Conclusion

For the reasons stated herein, the plaintiff's motion for partial summary judgment on Count One of the First Amended Complaint is GRANTED. The Court hereby declares DOC policy number 15.5.05–2 and DOC policy number 9.14–1 unconstitutional because they violate the Fourth Amendment. Furthermore, the Court restrains and enjoins the defendants' from conducting strip and visual body cavity searches in accordance with those policies.

The plaintiff's motion for partial summary judgment on Count Two of the First Amended Complaint is moot. It relates to a class action, and by a Memorandum and Order dated January 6, 2000, the Court denied the plaintiff's motion to certify a class.

The defendants' motion for summary judgment is DENIED.

SO ORDERED.

### AMENDED DECISION

On March 16, 2000, this Court issued a Memorandum and Decision ("March 16 Decision") in this action. That Memorandum and Decision enjoined the defendants from conducting certain strip and visual body cavity searches and declared two Department of Corrections policies relating to those searches to be unconstitutional. On March 22, 2000, the defendants moved pursuant to Fed. R. Civ. P. 60 for a clarification of that decision.

### I. Discussion

#### A. The Caption

The defendant's first request for clarification concerns the case caption included in the Court's March 16 Decision. On January 5, 2000, the Court granted the plaintiff leave to file an amended complaint. The plaintiff filed his First Amended Complaint on January 28, 2000. That complaint substituted new defendants for the Jane and John Doe defendants included in the caption of the initial complaint.

The defendants have asked this Court to amend its March 16 Decision to reflect the caption as it appeared in the initial complaint. Defendants assert that they were never served with a copy of the First Amended Complaint; the Court's file supports that assertion. The Court therefore grants the defendants' motion to amend on this ground, and amends the March 16, 2000, decision to include the caption listed in this Amended Decision.

#### B. The Substantive Clarification

■ The defendants next ask for a clarification of the scope of the Court's declaration and the injunctive relief rewarded. Particularly, the defendants argue that the March 16 Decision, as written, nullifies DOC policies 15.5.05–2 and 9.14–1 *in toto*, thus prohibiting the use of other security procedures contained within those documents. The Court amends its March 16 Decision and declares unconstitutional the strip and visual body cavity search provisions of policies 15.5.05–2 and 9.14–1 insofar as those policies are universally applied to pre–arraignment detainees without any prior determination that there is a reasonable suspicion that the individual may be carrying weapons or contraband.

Finally, the defendants have asked this Court to amend the March 16 Decision to narrow the scope of the injunctive relief granted. The defendants aver that, as written, the March 16 Decision enjoins all strip and visual body cavity searches at the Department of Corrections. To clarify this confusion as to the scope of the injunctive relief afforded in the March 16 Decision, the Court amends it to enjoin the Department of Corrections from conducting strip and visual body cavity searches of pre–arraignment detainees that are not found upon a reasonable suspicion that the particular detainee is concealing weapons or contraband.[1]

### II. Conclusion

The Court hereby amends its March 16, 2000, Memorandum and Decision to be consistent with the text of this Amended Decision.

SO ORDERED.

---

**1.** The Court will not revisit the paramenters of the reasonable suspicion calculus, as the March 16 Decision already addresses the issue.