# United States Court of Appeals
## For the First Circuit

No. 02-1568

ANGELA SAVARD, ET AL.,

Plaintiffs, Appellants,

v.

STATE OF RHODE ISLAND, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

Gregory A. Belzley with whom Frost Brown Todd LLC, Thomas W. Kelly and the Law Offices of Thomas W. Kelly were on brief for appellants.
Rebecca Tedford Partington, Deputy Chief, Civil Division, with whom Sheldon Whitehouse, Attorney General, was on brief for appellees.

February 11, 2003

**BOWNES**, <u>**Senior Circuit Judge**</u>. Plaintiffs-appellants were all arrested in Rhode Island for non-violent, non-drug related minor offenses. After their arrest, the plaintiffs were taken to a Rhode Island prison and subjected to unconstitutional strip and visual body cavity searches. The plaintiffs brought suit against the defendants-appellees, who include the State of Rhode Island and numerous prison officials, pursuant to 42 U.S.C. § 1983 and various state laws for damages sustained as a result of the illegal searches. The district court granted the defendants' motion for summary judgment on the ground that the defendants were entitled to qualified immunity, and therefore shielded from lawsuits seeking damages for their actions. We reverse.

## I.  BACKGROUND

The state of Rhode Island operates the Adult Correctional Institution ("ACI"), which consists of seven separate prison facilities. One of those facilities receives all males committed to the custody of Rhode Island's Department of Corrections, regardless of the nature of an arrestee's offense. This facility houses not only pretrial arrestees, but also newly sentenced inmates awaiting transport to other facilities, pretrial protective custody detainees, and sentenced inmates under protective custody. All of these individuals are at times commingled with each other, except for those held in protective custody. Even then, inmates held in protective custody use the same facilities as other

detainees, but at different times.  Females are processed through a different ACI facility.  At the female facility, arrestees are commingled with either sentenced inmates or inmates awaiting trial.

At the times material hereto, Rhode Island maintained written policies that required new arrestees admitted into ACI to undergo strip searches and visual body cavity searches.[1]  These searches included "examination of hair, arms, hands, ears, mouth, nose; visual examination of groin and rectum; toes and soles of feet."  As part of the searches, males were required to "lift their penises and testicles on the officer's command to provide a clear view of the groin area."  Both male and female detainees were required "to bend over and spread the rectum to provide a clear view of the area."

On April 20, 1999, Craig Roberts ("Roberts") was a passenger in a car stopped by the police for expired registration stickers.  A check of police computers revealed that Roberts was the subject of an "outstanding body attachment," a type of writ issued by a magistrate in Rhode Island family court.  The police frisked Roberts, but found no weapons or contraband.  Although Roberts produced a carbon-copy of a family court order withdrawing

---

[1]A "strip search" is a visual inspection of an inmate's naked body.  A "visual body cavity search" is a strip search that includes the visual inspection of an inmate's anal and genital areas.  See Blackburn v. Snow, 771 F.2d 556, 561 n.3 (1st Cir. 1985).

the body attachment, the police arrested Roberts and took him to ACI.

Upon arriving at ACI, Roberts was subjected to a strip and visual body cavity search pursuant to the written policies described above. No weapons or contraband were found. After the search, Roberts was placed in a segregated cell. Later that day, Roberts was subjected to another strip and visual body cavity search in preparation for his transportation to the Garrahy Judicial Complex. Again, no weapons or contraband were found. After arriving at the complex, Roberts' carbon-copy of the order withdrawing the body attachment was shown to a sheriff and Roberts was released.

In 1999, Roberts brought a complaint in the district court alleging that the strip and visual body cavity searches required by Rhode Island's written policies violated his Fourth Amendment right to be free from unreasonable searches. Upon cross-motions for summary judgment, the district court ruled that the searches were unconstitutional and issued an order enjoining Rhode Island from conducting searches in accordance with those written policies. Roberts v. Rhode Island, 175 F. Supp.2d 176, 183 (D.R.I. 2000). On appeal, we affirmed the district court's ruling. Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001).

In 2000, Roberts and other similarly situated individuals brought a separate action in the district court against Rhode

Island and various prison officials alleging that the searches violated their constitutional rights and seeking damages under 42 U.S.C. § 1983, state tort law, and state statutory law. Like Roberts, the new plaintiffs all claimed they were arrested for non-violent, non-drug related minor offenses and subjected to strip and visual body cavity searches at ACI prior to March 17, 2000. By way of example, one of the new plaintiffs, George Barber, loaned his car to his son in 1993 and the son received a traffic ticket that was never paid. Six years later, Barber was arrested because of the unpaid ticket, held at ACI overnight and strip searched twice. Another plaintiff, Stephanie Clark, called police for assistance after an auto accident and was arrested because a computer check showed an outstanding arrest warrant for her failure to appear at a probation review. Clark had already finished her probation and the warrant was issued in error. She was taken to ACI and strip searched twice.

Upon the defendants' motion, the district court dismissed Roberts' claim based on the doctrine of res judicata. The defendants then moved for summary judgment as to the remaining plaintiffs. The district court granted the motion on the ground that qualified immunity shielded the defendants from damages. According to the district court, the defendants were entitled to qualified immunity because it was not the "clearly established" law in this circuit that prison officials needed at least reasonable

suspicion that arrestees for minor offenses were carrying weapons or contraband before conducting strip and visual body cavity searches.

## II. DISCUSSION

We review a district court's grant of a motion for summary judgment de novo; we examine the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. See Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir. 2000). A motion for summary judgment should be granted only if there is an absence of "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 61 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

"Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment." Ryder v. United States, 515 U.S. 177, 185 (1995). The purpose of the qualified immunity doctrine is to balance the need to vindicate constitutional rights against the need to protect public officials from litigation that could inhibit the discharge of their duties. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). In balancing those needs, we use a three step analysis. See Suboh v. Dist. Attorney's Office of the Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002).

## 1.  Violation of a Constitutional Right

The first step is to ask whether the facts alleged by the plaintiffs show that the conduct of the public officials violated a constitutional right.  See Saucier v. Katz, 533 U.S. 194, 201 (2001); Wilson v. Layne, 526 U.S. 603, 609 (1999).  The district court's decision, and our affirmance, in Roberts' earlier lawsuit makes clear that Rhode Island's strip and visual body cavity searches without reasonable suspicion violated a constitutional right.  See Roberts, 239 F.3d at 113; Roberts, 175 F. Supp.2d at 183.

## 2.  Clearly Established

The second step is to ask "whether that right was clearly established at the time of the alleged violation."  Conn v. Gabbert, 526 U.S. 286, 290 (1999).  The purpose of this step is "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Saucier, 533 U.S. at 206.  This means that in the present case we must determine whether it was the clearly established law that prison officials needed at least reasonable suspicion before subjecting the plaintiffs to strip and visual body cavity searches.

The district court held that the law was not clearly established.  In doing so, the district court based its decision largely on our statement in Roberts' earlier appeal that "[t]he institutional security concerns in play here fall somewhere

-7-

between" other cases that have been decided by this court. Roberts, 239 F.3d at 111. The district court concluded from our statement that the unlawfulness of the ACI strip search policy could not have been apparent to the defendants. After careful examination, we think the district court assigned too much meaning to our statement. The statement simply recognizes that the facts involved in this case are different than those of previous cases. The Supreme Court recently explained in Hope v. Pelzer, 122 S. Ct. 2508, 2516 (2002), that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."

In the same vein, the district court concluded that cases from other circuits were of "limited application" to its analysis because they involved different factual predicates than the present case. Specifically, the district court said that cases from other circuits "do not involve institutions designed like the ACI, where pretrial detainees are mixed in with the general prison population." To support its conclusion, the district court relied on reasoning from the Eleventh Circuit, which had developed a line of decisions that found the law "clearly established" only when the facts of previous cases were materially similar to the present case. See Hope v. Pelzer, 240 F.3d 975, 981 (11th Cir. 2001); Suissa v. Fulton County, Ga., 74 F.3d 266, 269-70 (11th Cir. 1996);

-8-

Lassiter v. Alabama A&M Univ., Bd. of Trustees, 28 F.3d 1146, 1150 (11th Cir. 1994).

Shortly after the district court's decision, the Supreme Court in Hope explicitly overruled the cases from the Eleventh Circuit upon which the district court relied. See 122 S. Ct. at 2515. The Supreme Court said that considering only those cases with similar facts, as the district court did here, is a "rigid gloss on the qualified immunity standard . . . [that] is not consistent with our cases." Id. The Court further stated that "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Id. Our cases are consistent with the Court's decision in Hope. See Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 22 (1st Cir. 2001); El Dia, Inc. v. Rossello, 165 F.3d 106, 109 (1st Cir. 1999); Germany v. Vance, 868 F.2d 9, 16 (1st Cir. 1989).

We therefore conclude that the district court's analysis was flawed because it overemphasized our statement in Roberts' earlier appeal and failed to properly weigh relevant decisions from other circuits. We consider it unnecessary, however, to remand this matter to the district court because the question of whether a right is clearly established is an issue of law. See Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 35 (1st Cir. 2002) ("[Q]ualified immunity analysis under § 1983 involves a

-9-

quintessential legal question:  whether the rights at issue are clearly established.").  We instead proceed on our own to determine whether our cases, as well as those from other circuits, clearly established that reasonable suspicion was needed before prison officials could subject people arrested for minor offenses to strip and visual body cavity searches.

We begin by noting that our inquiry is time-sensitive.  See Hatch, 274 F.3d at 22.  Qualified immunity is available to the defendants if, at the time of the alleged violations, the law was not clearly established.  See id.  The parties all agree that the operative date for our analysis is March 17, 2000.

"One tried and true way of determining whether [a] right was clearly established . . . is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights."  Suboh, 298 F.3d at 93.  After thoroughly reviewing the law, we find that existing cases gave the defendants plenty of fair warning that, prior to March 17, 2000, reasonable suspicion was needed in order to subject people arrested for minor offenses to strip and visual body cavity searches.

The place to start our analysis is with the Supreme Court's decision in Bell v. Wolfish, 441 U.S. 520 (1979).  In that case, the Court upheld a strip and visual body cavity search of pretrial detainees.  In doing so, the Court conducted an analysis that balanced the need for the searches against the invasion of

-10-

personal rights.  Id. at 559.  Although the Court said that the practice of strip searching individuals "instinctively gives us the most pause," it found the searches constitutional because of the security needs of the prison.  Id. at 559-60.  But the Court was clear to delineate the scope of its holding:

> [W]e deal here with the question whether visual body-cavity inspections . . . can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can.

Id. at 560 (emphasis in original).  In other words, Bell established the ceiling; it made clear that prison officials did not necessarily need probable cause to strip search pretrial detainees.  But Bell left the floor undefined.  Still ambiguous was whether prison officials needed any level of particularized suspicion that detainees were carrying contraband or weapons before conducting strip searches.

Our early cases applying Bell to the prison environment dealt largely with situations involving prison visitors.  In one of our first prison visitor cases, Blackburn v. Snow, 771 F.2d 556, 567 (1st Cir. 1985), we held that:

> [T]he Constitution requires a more particularized level of suspicion to justify the humiliating and intrusive searches conducted here. While we need not define here precisely what level of individualized suspicion is required . . . a rule unabashedly requiring none cannot be reconciled with the Fourth Amendment.

-11-

See also <u>Cochrane</u> v. <u>Quattrocchi</u>, 949 F.2d 11, 13 (1st Cir. 1991).

In <u>Wood</u> v. <u>Clemons</u>, 89 F.3d 922, 928 (1st Cir. 1996), we clarified that the level of particularized suspicion required before subjecting prison visitors to strip searches was "reasonable suspicion." We said that "a strip search cannot be justified absent some quantum of *individualized suspicion*. In determining the *level* of individualized suspicion . . . courts have converged upon one common benchmark: the standard of 'reasonable suspicion.'" <u>Id.</u> (emphasis in original) (citations omitted).

Our cases addressing strip and visual body cavity searches were not limited to prison visitors. We required reasonable suspicion for strip searches at border crossings. <u>See</u> <u>United States</u> v. <u>Uricoechea-Casallas</u>, 946 F.2d 162, 166 (1st Cir. 1991). And most significantly for this case, we demanded in <u>Swain</u> v. <u>Spinney</u>, 117 F.3d 1, 7 (1st Cir. 1997), that prison officials possess reasonable suspicion to conduct strip and visual body cavity searches of arrestees.

In <u>Swain</u>, we examined our prior cases dealing with prison visitors and border searches, as well as relevant cases from other circuits. We concluded that "it is clear that at least the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context as well." <u>Id.</u> This ruling was consistent with cases from numerous other circuits. <u>See</u> <u>Justice</u> v. <u>City of Peachtree City</u>, 961 F.2d 188, 193 (11th Cir. 1992); <u>Masters</u>

-12-

v. <u>Crouch</u>, 872 F.2d 1248, 1255 (6th Cir. 1989), <u>cert. denied</u>, 493 U.S. 977 (1989); <u>Weber</u> v. <u>Dell</u>, 804 F.2d 796, 802 (2d Cir. 1986), <u>cert. denied</u>, 483 U.S. 1020 (1987); <u>Jones</u> v. <u>Edwards</u>, 770 F.2d 739, 742 (8th Cir. 1985); <u>Stewart</u> v. <u>Lubbock County, Tex.</u>, 767 F.2d 153, 156-57 (5th Cir.), <u>cert. denied</u>, 475 U.S. 1053 (1985); <u>Giles</u> v. <u>Ackerman</u>, 746 F.2d 614, 618 (9th Cir. 1984), <u>cert. denied</u>, 471 U.S. 1053 (1985); <u>Hill</u> v. <u>Bogans</u>, 735 F.2d 391, 394 (10th Cir. 1984); <u>Mary Beth G.</u> v. <u>City of Chicago</u>, 723 F.2d 1263, 1273 (7th Cir. 1983); <u>Logan</u> v. <u>Shealy</u>, 660 F.2d 1007, 1013 (4th Cir. 1981), <u>cert. denied</u>, 455 U.S. 942 (1982).

Not only did we hold in <u>Swain</u> that reasonable suspicion was required to strip search arrestees, we also determined when analyzing the issue of qualified immunity that "it was *clearly established* at the time of the search [May 18, 1993] that the Fourth Amendment requires at least a reasonable suspicion to conduct these types of searches." 117 F.3d at 5 (emphasis added). This ruling too was in accord with decisions by other circuits. <u>See</u> <u>Chapman</u> v. <u>Nichols</u>, 989 F.2d 393, 398 (10th Cir. 1993) (holding that it was clearly established that a strip search policy applied to minor offense detainees without particularized reasonable suspicion was unlawful); <u>Masters</u>, 872 F.2d at 1255 ("The decisions of all the federal courts of appeals that have considered the issue reached the same conclusion: a strip search of a person arrested for a traffic violation or other minor offense not normally

associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable. We believe the right of such a person to be free of such a search was 'clearly established' on October 21, 1986."); Weber, 804 F.2d at 803 (denying qualified immunity for defendants who performed suspicionless strip searches on arrestees because "at least eleven circuit court decisions . . . hold similar policies unconstitutional"); Jones, 770 F.2d at 742 n.4 (denying defendants qualified immunity because the Fourth Amendment's protection against suspicionless strip searches of arrestees was well established). In short, the defendants had more than fair warning that, prior to March 17, 2000, prison officials needed reasonable suspicion that arrestees for minor offenses, like the plaintiffs in this case, were concealing contraband or weapons before conducting strip and visual body cavity searches.

The defendants' principal argument is that, despite the overwhelming precedent described above, it was still unclear whether reasonable suspicion was required when arrestees were commingled with a general prison population, as was the case at the ACI facilities.

Admittedly, our precedent does not speak to commingling specifically. But as early as Blackburn, we rejected the argument that "the security needs of a prison can, *standing alone*, properly

-14-

justify the 'complete withdrawal' of Fourth Amendment rights from *all* who enter [a prison]." 771 F.2d at 563 (emphasis in original); see also Logan, 660 F.2d at 1013 ("An indiscriminate strip search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.").

Cases from other circuits are more explicit; they refute the defendants' argument with such clarity that we have little trouble concluding that, when read in conjunction with our opinions, the defendants had fair warning that commingling alone could not justify suspicionless strip searches of arrestees. Most notable is the Sixth Circuit's holding in Masters v. Crouch, 872 F.2d 1248, 1254 (6th Cir. 1989):

> [T]he fact of intermingling [with other prison inmates] alone has never been found to justify such a search without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution.

Other circuits too have found commingling to be an insufficient basis upon which to abandon the need for reasonable suspicion. The Second Circuit in Walsh v. Franco, 849 F.2d 68, 69 (2d Cir. 1988), ruled that a blanket strip search of all misdemeanor arrestees was not permissible simply because those arrestees were commingled among arraigned inmates. The court explained that "the risk of a misdemeanor arrestee's introducing

-15-

contraband into the general jail population simply did not warrant a strip search of all arrestees and that particularized suspicion is required for strip-searching any person arrested for a misdemeanor or other minor offense."  Id.

The Ninth Circuit in Giles v. Ackerman, 746 F.2d 614, 618 (9th Cir. 1984), adopted similar logic.  The court explained that blanket strip search policies cannot deter arrestees from smuggling contraband into a jail because arrests are unplanned events.  Id. The court concluded "that defendants' heavy reliance on the intermingling of its temporary detainees with the general [jail] population is misplaced because such intermingling is both limited and avoidable."  Id. at 619 (citation and internal quotation marks omitted) (alteration in original).  The Tenth Circuit has held to the same effect.  See Chapman, 989 F.2d at 396 (rejecting the defendant's argument "that the invasion posed by his policy is justified by the need for jail security because women detainees must be incarcerated in one cell with the general jail population"); Hill, 735 F.2d at 394 (rejecting intermingling argument because "intermingling is only one factor to consider in judging the constitutionality of a strip search").

The defendants' final argument is that our decision in Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983), made the law unclear regarding the need for reasonable suspicion when strip searching arrestees who would ultimately be commingled with other inmates in

-16-

a maximum security prison. In <u>Arruda</u>, we upheld a policy of strip searching inmates at MCI-Walpole, a Massachusetts maximum security prison. See <u>id.</u> at 888. Nowhere in that opinion did we articulate a need for reasonable suspicion. The defendants say that ACI is a maximum security prison too, and therefore <u>Arruda</u> suggests that no reasonable suspicion is needed to conduct strip and visual body cavity searches of arrestees brought to ACI. This argument is unpersuasive for two reasons. First, as we have already discussed, our cases since <u>Arruda</u> have made clear that reasonable suspicion is required to strip search arrestees. See <u>Swain</u>, 117 F.3d at 7. Second, <u>Arruda</u> was a case involving "particularly dangerous prisoners." 710 F.2d at 887. The plaintiff himself was a convicted felon assigned to a special cell block, which we described as a "prison within a prison, designed to hold the most dangerous inmates." <u>Id.</u> The plaintiff was assigned to this special cell block for assaulting another prisoner. In addition, the plaintiff testified that, while a prisoner, he possessed drugs and a weapon. <u>Id.</u> at 888.

Based on these facts, we have no difficulty concluding that the defendants could not rely on <u>Arruda</u> to justify their actions. It is simply not reasonable to equate people arrested for non-violent, non-drug related minor offenses with a convicted felon who, while incarcerated, possessed contraband and a weapon,

assaulted a fellow prisoner, and was confined to a special cell block designed to hold dangerous inmates.

In light of our prior case law, as well as decisions from other circuits, we conclude that the defendants had fair warning that subjecting arrestees for minor offenses to strip and visual body cavity searches without any reasonable suspicion was a violation of the Fourth Amendment, even though the arrestees were commingled with other inmates. The law was clearly established for purposes of qualified immunity.

## 3. Objective Reasonableness

Having concluded that the law clearly established the plaintiffs' right to be free from suspicionless strip and visual body cavity searches, we now address the third and final step in the qualified immunity analysis. The defendants are entitled to qualified immunity if objectively reasonable prison officials in the defendants' position would believe that their conduct was lawful in light of clearly established law. See Suboh, 298 F.3d at 95; Swain, 117 F.3d at 9. This is a legal question, but we have repeatedly recognized that "[a] determination of objective reasonableness 'will often require examination of the information possessed' by the defendant officials." Kelly v. Laforce, 288 F.3d 1, 7 (1st Cir. 2002) (quoting Anderson, 483 U.S. at 641); see also Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000); Sheehy v. Town of Plymouth, 191 F.3d 15, 19 (1st Cir. 1999); McBride v.

<u>Taylor</u>, 924 F.2d 386, 389 (1st Cir. 1991); <u>Floyd</u> v. <u>Farrell</u>, 765 F.2d 1, 6 (1st Cir. 1985).

Mindful that the reasonableness inquiry is "highly fact specific," <u>Swain</u> 117 F.3d at 9, any determination we make would require examining the record for evidence that the defendants had reasonable suspicion, albeit mistakenly, that the plaintiffs were concealing contraband or weapons. Reasonable suspicion can arise from a wide variety of circumstances, including "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." <u>Weber</u>, 804 F.2d at 802; <u>Giles</u>, 746 F.2d at 617; <u>see also</u> <u>Roberts</u>, 239 F.3d at 113 (stating that reasonable suspicion can be based on "observations of a particular inmate during a less invasive pat-down frisk and clothing search, or based on contraband found during that search").

The record before us, however, is barren of any facts regarding what the prison officials knew, or did not know, about the plaintiffs. The only facts we have are those from the parties' pleadings and those facts contained in the decisions by this court and the district court in Roberts' first round of litigation. The facts developed there were based on a "joint factual stipulation" submitted by the parties to the district court. The record now before us does not contain the joint factual stipulation. Even if it did, the joint stipulation pertains only to Roberts. As far as we can tell, the parties have not stipulated to all the facts

regarding any of the other plaintiffs. Given the state of the record, we must remand this case to the district court for a determination of the third step in the qualified immunity analysis, as well as the other issues in the litigation.

## III. CONCLUSION

The law was clearly established on March 17, 2000, that people arrested for non-violent, non-drug related minor offenses could not be subjected to strip and visual body cavity searches absent reasonable suspicion that they were concealing contraband or weapons, even when those arrestees were commingled with general prison populations. The district court's decision granting qualified immunity to the defendants-appellees is therefore **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion. Costs on appeal are awarded to plaintiffs-appellants.

So ordered.